1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    REYES Y. RIOS,

11              Petitioner,                    No. CIV S-05-1711 MCE DAD P

12         vs.

13    K. MENDOZA-POWERS, et al.

14              Respondent.                    FINDINGS AND RECOMMENDATIONS

15    _____/

16              Petitioner is a former state prisoner proceeding pro se with an application for a

17    writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges California Governor

18    Arnold Schwarzenegger's reversal of the 2004 decision by the Board of Parole Terms

19    (hereinafter the "Board")[1] finding petitioner suitable for parole.  In addition, petitioner claims

20    that the Governor exceeded his authority by applying a law to him that was not in effect at the

21    time of petitioner's conviction, in violation of the Ex Post Facto Clause.  Upon careful

22    consideration of the record and the applicable law, the undersigned recommends that petitioner's

23    application for habeas corpus relief be granted with respect to his due process claim.

24    /////

25    _____

26         [1]  California has since replaced the Board of Prison Terms with the Board of Parole
      Hearings.  See California Penal Code § 5075(a).

PROCEDURAL BACKGROUND

I.  The Instant Case

On April 21, 1988, petitioner was convicted in the Sacramento County Superior Court of second degree murder in violation of California Penal Code § 187.  (Answer, Ex. 1, Ex. 2 at 3.)  On July 18, 1989, he was sentenced to 16 years to life in state prison for that offense, including a one-year sentencing enhancement pursuant to California Penal Code § 12022(b) for the use of a deadly weapon.  (Id.)

On May 3, 2004, petitioner appeared before the Board for his fourth subsequent parole consideration hearing and was found suitable for parole.  (Traverse at 2.)  At that time, petitioner had served 17 years of his 16 years to life sentence.  (Answer, Ex. 3 at 3.)  The Board tentatively set a parole release date and that decision was approved and became final on August 31, 2004.  (Id. at 1.)  On September 30, 2004, the Governor reversed the Board's grant of parole. (Id. & Ex. 2.)

Petitioner subsequently filed an application for a writ of habeas corpus in Sacramento County Superior Court, in which he challenged the Governor's decision finding him unsuitable for parole.  (Answer, Ex. 3)  On December 15, 2004, in a reasoned decision, the Superior Court denied the petition.  (Id.)  On January 3, 2005, petitioner filed an application for a writ of habeas corpus in the California Court of Appeal for the Third Appellate District. (Answer, Ex. 4.)  That petition was summarily denied by order dated February 10, 2005.  (Id.) Petitioner subsequently filed an application for a writ of habeas corpus in the California Supreme Court, which was summarily denied on August 10, 2005.  (Answer, Ex. 5.)

On August 24, 2005, petitioner filed the habeas petition pending before this court. On October 7, 2005, respondents moved to dismiss the petition for lack of subject matter jurisdiction.  That motion was denied on September 5, 2006.  Respondents were then ordered to file a response to the petition.  Respondents filed an answer on October 5, 2006, and petitioner filed his traverse on October 25, 2006.  Petitioner was released from prison on April 4, 2007.

II.  Case No. CIV S-06-1047 MCE GGH P

On August 23, 2005, less than one year after the Governor's reversal of the Board's 2004 grant of parole at issue in this action, petitioner appeared again before the Board for his fifth subsequent parole consideration hearing.  (Traverse at 2.)  This time, the Board found petitioner unsuitable for parole.  Rios v. Mendoza-Powers, CIV S-06-1047 MCE GGH P, 2007 WL 2155730, at *3 (E.D. Cal. July 26, 2007).  On May 12, 2006, after exhausting his state court remedies, petitioner filed a habeas petition in this court challenging the Board's 2005 denial of parole.  Id.  District Judge Morrison E. England, Jr. and Magistrate Judge Gregory G. Hollows were the judges assigned to that action.

As noted, petitioner was released from prison on April 4, 2007.  After petitioner filed a notice of change of address which reflected that he had been released on parole, Magistrate Judge Hollows ordered petitioner to show cause why his petition in CIV S-06-1047 MCE GGH P should not be dismissed as moot.  After receiving briefing on this issue, Magistrate Judge Hollows concluded that the petition was not moot.[2]  However, he recommended that the petition be denied on the merits, finding that the circumstances of petitioner's offense constituted "some evidence" supporting the Board's unfavorable suitability decision.[3]  On September 14,

_____

[2]  Magistrate Judge Hollows reasoned that "were this court to find that petitioner should have been found suitable [for parole], the time he spent incarcerated until he was released on parole would be applied to his parole term pursuant to the reasoning of the state appellate court in In re Smith.  For this reason, the court finds that this action is not moot."  (CIV S-06-1047 MCE GGH P, Doc. No. 15 at 2-3.)  At the time Magistrate Judge Hollows issued this decision, it appeared that petitioner was subject to a determinate five-year parole term following his release.  Subsequently, that was changed to an indeterminate life term.  In In re Smith, the case relied on by Judge Hollows, the California Court of Appeal for the Sixth District in an unpublished decision had held that California law required the parole term for one serving an indeterminate sentence be reduced when it is determined that he had served time in excess of the "base term" established by the Board.  Subsequently, the California Court of Appeal for the First Appellate District reached the opposite conclusion.  See In re Bush, 161 Cal. App. 4th 133 (2008).

[3]  Magistrate Judge Hollows' recommendation that the petition be denied on the merits was expressly based on the decision in Bulpitt v. Mendoza-Powers, Case No. 2:06-CV-0566 MCE GGH P, in which a recommendation that the petitioner be granted habeas relief because the Board's decision denying parole was not supported by "some evidence" had been rejected by the assigned District Judge.  (Id., Doc. Nos. 9, 14.)

2007, District Judge England adopted those Findings and Recommendations and judgment was

entered denying the petition in Case No. CIV S-06-1047 MCE GGH P.

III.  Mootness

By order dated April 16, 2009, this court requested that respondent file a brief

addressing whether the petition pending before this court was rendered moot by petitioner's

release from prison.  Specifically, the court asked whether relief would still be available to

petitioner in the event that this court found the Governor's reversal of the Board's 2004

suitability decision violated petitioner's right to due process.[4]  Both parties have filed briefs in

response to this order.

A.  Background

All parties agree that petitioner is subject to parole as set forth in California Penal

Code § 3000.1, which provides as follows:

> (a) In the case of any inmate sentenced under [California Penal
> Code] §1168 for any offense of first or second degree murder with
> a maximum term of life imprisonment, the period of parole, if
> parole is granted, shall be the remainder of the inmate's life.
>
> (b) Notwithstanding any other provision of law, when any person
> referred to in subdivision (a) has been released on parole from the
> state prison, and has been on parole continuously for. . . five years
> in the case of any person imprisoned for second degree murder,
> since release from confinement, the board shall, within 30 days,
> discharge that person from parole, unless the board, for good cause,
> determines that the person will be retained on parole.  The board
> shall make a written record of its determination and transmit a
> copy of it to the parolee.

/////

---

[4]  The court also directed respondent to provide the court with "the transcript and all related materials pertaining to petitioner's 2004 parole hearing before the Board in order to allow the court to properly evaluate the Governor's reversal of the Board's 2004 decision."  (Doc. No. 15 at 4.)  The language of that order was, unfortunately, unnecessarily broad.  In response thereto respondent filed a "Notice of Lodgment" consisting of approximately 1250 pages.  (Doc. No. 20) (hereinafter "lodgment").  The undersigned has reviewed the documents submitted in the lodgment.  Given the length of the lodgement, however, all citations to these documents will be referenced by sections designated by the court, using page numbers when possible.

1    Respondent argues that because petitioner is subject to lifetime parole pursuant to

2 California Penal Code § 3000.1, there is no effective relief this court could grant (in the form of

3 release from parole supervision) if his habeas petition is granted.  Therefore, according to

4 respondent, the instant petition is moot.  (Resp't's Brief, at 1, 3.)  In the alternative, respondent

5 contends that if "[petitioner's] due process rights were violated by the Governor's decision . . .

6 then the appropriate remedy is a remand to the Governor to proceed in accordance with due

7 process, as ordered by the Court."  (Id. at 2.)[5]

8    Petitioner, on the other hand, contends that "the petition is not moot and that

9 petitioner is entitled to time spent in illegal custody credited toward his mandatory parole

10 period."  (Pet'r's Brief filed June 29, 2009 at 1.)  In this regard, petitioner explains:

11    Denying petitioner...credit toward his parole period for excess time
      spent in prison after a judgment his incarceration during that period
12    was unlawful is... 'unreasonably harsh.'  It would not only serve to
      deny petitioner any credit at all for time spent in a conforming
13    manner in state custody, but it would deny him credit for time
      spent unlawfully in state custody.  That is patently and
14    fundamentally unfair.

15                                    ***

16    The Court must remember granting this credit would not entitle
      petitioner to discharge from parole supervision, rather it would
17    only advance the point in time that petitioner would be eligible for
      a discretionary discharge review by parole officials.

18

19 _____

20    [5] Petitioner's crime of commitment occurred on December 30, 1986 and petitioner was
   taken into custody on January 1, 1987.  (Answer, Ex. 2 at 3, Ex. 3 at 3.)  California Penal Code §
21 3000.1 was passed in 1982, 25 years before petitioner's release from prison.  It appears that the
   state may have failed to recognize the significance of § 3000.1 to prisoners convicted after its
22 effective date.  The court notes that on April 4, 2007, upon his release from prison, petitioner
   signed a document entitled "Notice and Conditions of Parole," in which he acknowledged that he
23 would be subject to a three-year period of parole.  (Lodgment, at consecutive p. 4.)  However,
   respondent has filed a more recent version of that same form, in which petitioner's period of
24 parole has been changed from "3 years" to "Life," and petitioner's signature has been updated to
   May 19, 2009, one month after this court ordered briefing on the issue of mootness.  (Resp't's
25 Brief filed June 1, 2009, Ex. 1.)  It appears that the state belatedly realized petitioner was subject
   to the terms of § 3000.1 and caused the updated form to be generated.  Nonetheless, petitioner
26 does not contend that his parole term is three years because of representations made to him on the
   2007 form or expectations arising therefrom.

1    (Id. at 4.) (emphasis in original.)  Finally, petitioner states that a remand to the Governor would

2    be "pointless" in his case.  (Id. at 2.)

3            B.  Relevant Law

4            "Article III, Section 2 of the United States Constitution establishes the scope of

5    federal court jurisdiction, which includes 'all Cases . . . arising under this Constitution . . . [and]

6    Controversies to which the United States shall be a Party . . . ."  Burnett v. Lampert, 432 F.3d

7    996, 999 (9th Cir. 2005).  Mootness is jurisdictional.  Id.; Foster v. Carson, 347 F.3d 742, 745

8    (9th Cir. 2003) ("[F]ederal courts 'have no jurisdiction to hear a case that is moot, that is, where

9    no actual or live controversy exists.'") (quoting Cook Inlet Treaty Tribes v. Shalala, 166 F.3d

10   986, 989 (9th Cir. 1999)).  To avoid dismissal on mootness grounds, the court must determine

11   that the habeas petitioner continues to have a "personal stake in the outcome of the lawsuit."

12   United States v. Verdin, 243 F.3d 1174, 1177 (9th Cir. 2001).  In this regard, "throughout the

13   litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the

14   defendant and likely to be redressed by a favorable decision."  Spencer v. Kemna, 523 U.S. 1, 7

15   (1998) (internal quotation marks and citations omitted).  "Thus, in deciding a mootness issue, the

16   question is not whether the precise relief sought  . . . is still available; rather, the question is

17   whether there can be any effective relief."  Hamilton v. Schwartz, No. CV 08-04551-JVS (VBK),

18   2009 WL 2380093, at *2 (C.D. Cal. July 30, 2009) (quoting Northwest Environmental Defense

19   Center v. Gordon, 894 F.2d 1241 (9th Cir. 1988)).  A party moving for dismissal on mootness

20   grounds "bears a heavy burden."  Hunt v. Imperial Merchant Services, Inc., 560 F.3d 1137, 1141

21   (9th Cir. 2009) (quoting Demery v. Arpaio, 378 F.3d 1020, 1025 (9th Cir. 2004)).

22           Under California law, "an inmate-turned-parolee remains in the legal custody of

23   the California Department of Corrections through the remainder of his term, and must comply

24   with all of the terms and conditions of parole, including mandatory drug tests, restrictions on

25   association with felons or gang members, and mandatory meetings with parole officers."

26   Samson v. California, 547 U.S. 843, 851 (2006)  The restrictions imposed on a parolee constitute

1   a concrete injury for purposes of a mootness analysis.  See, e.g., Spencer, 523 U.S. at 7-8

2   (restrictions imposed by the terms of the parole constitute a concrete injury); Jones v.

3   Cunningham, 371 U.S. 236, 243 (1963) (same).

4           The question of when a collateral attack on a parole denial is rendered moot by a

5   subsequent grant of parole has recently been addressed by the California courts.  In In re

6   Chaudhary, 172 Cal. App. 4th 32 (2009), the California Court of Appeal for the Sixth Appellate

7   District reversed a decision by the Superior Court to credit the excess time Chaudhary had served

8   in prison in violation of his due process rights to his parole term under § 3000.1(b).  The

9   appellate court in that case held:

> Section 3000.1's five-year parole discharge eligibility requirement
> is expressly limited to the period of time after the parolee "has
> been released on parole" and requires that the parolee serve five
> continuous years on parole "since [the parolee's] release from
> confinement."  By placing these explicit limitations on the parole
> discharge eligibility requirement, the Legislature made
> unmistakably clear that a parolee must first have "been released on
> parole" and must then complete five continuous years on parole
> after the parolee's "release from confinement."  This intent
> explicitly precludes the application of any time spent in custody
> prior to release to satisfy any part of section 3000.1's five-year
> parole discharge eligibility requirement.
>
>                              * * *
>
> [ ] There is no way to apply 'credits' to a lifetime parole period.
> Even if we were to assume that a parolee would be entitled to
> credit against his or her parole period for time spent unlawfully
> incarcerated, that would not establish that section 3000.1's parole
> discharge eligibility requirement could be satisfied with such
> 'credits.'  The extremely clear language of section 3000.1
> establishes that time spent in prison prior to release from
> confinement cannot be applied to satisfy any part of section
> 3000.1's five-year parole discharge eligibility requirement.

23  Id. at 37-38.  The state appellate court in Chaudhary concluded that because the petitioner was

24  not entitled to a remedy under state law in the form of credit to his period of parole supervision,

25  his habeas petition was moot.

26  /////

1    　　　　　The same mootness question has also been addressed by the federal courts in

2    California.  In those cases where the petitioner is no longer subject to parole supervision after his

3    release, his pending habeas petition has been found moot.  See Hamilton, 2009 WL 2380093, at

4    *2-3 (where the state court granted the petitioner's habeas petition and issued an order

5    "extinguishing any and all parole outright," the federal petition was moot because there was no

6    longer any effective relief the court could grant).  Where a petitioner has been released to a

7    determinate period of parole supervision, federal courts have concluded that the petitioner,

8    should he prevail, may still obtain an order directing California authorities to credit him with the

9    time served in prison in violation of his constitutional rights towards his determinate period of

10   parole supervision.  See McQuillion v. Duncan, 342 F.3d 1012, 1015 (9th Cir. 2003)

11   ("McQullion II") (noting that the appropriate remedy was immediate release without parole

12   supervision where petitioner's three-year parole supervision period would have lapsed but for the

13   constitutional violation); Thomas v. Yates, 637 F.Supp.2d 837, 842 (E.D. Cal. 2009) (concluding

14   that the habeas petition challenging the denial of parole was not rendered moot despite

15   petitioner's release to a five-year determinate term of parole because the court could afford

16   petitioner a remedy with respect to the length of that parole term); Basque v. Schwartz, No. CIV

17   S-07-0258 GEB KJM P, 2009 WL 187920, at *2-3 (E.D. Cal. Jan. 20, 2009) (denying motion to

18   dismiss petition as moot where, if he prevailed, petitioner could obtain a reduction of the

19   mandatory determinate parole term by the length of time unlawfully spent in prison); Carlin v.

20   Wong, No. C 06-4145 SI, 2008 WL 3183163, at *2 (N.D. Cal. Aug. 4, 2008) ("Here, petitioner is

21   entitled to credit against his [five-year] parole period for his time in confinement that was in

22   violation of his due process rights.").  In such circumstances, federal courts have uniformly found

23   that a petition for writ of habeas corpus challenging an earlier parole denial on constitutional

24   grounds is not rendered moot by the petitioner's release from prison.[6]

25   

26   　　　　　[6] In Chaudhary, the California Court of Appeal for the Sixth Appellate District
distinguished several of these federal court decisions on the ground that the petitioners in those

1    Courts have reached differing conclusions in cases involving prisoners released to

2 an indeterminate period of parole, as is the case with petitioner in the present action.  In

3 Thompson v. Carey, No. CIV S-05-1708 GEB EFB P, 2009 WL 453053 (E.D. Cal. Feb. 23,

4 2009), amended Thompson v. Carey, 2009 WL 1212202 (E.D. Cal. May 5, 2009), Findings and

5 Recommendations adopted at 2009 WL 1605803 (E.D. Cal. June 8, 2009), the petitioner

6 prevailed on his challenge to several parole denials and was released on parole pursuant to

7 California Penal Code § 3000.1.  The district court concluded that the petitioner was entitled to a

8 ─────────────────

9 cases were subject to a determinate parole term, and not the indeterminate term imposed by
California Penal Code § 3000.1.  The state appellate court explained:

10    Chaudhary relies on cases that are readily distinguishable. *In re
11 Bush* (2008) 161 Cal. App.4th 133, 74 Cal.Rptr.3d 256 (*Bush*)
involved whether time spent in prison, prior to the release date set
12 by the Board, which exceeded the term set by the Board could be
credited against the parolee's parole period.  Unlike Chaudhary,
13 Bush, who had not been convicted of murder, was subject to a
maximum five-year parole period, not lifetime parole.  The court in
14 Bush did not consider whether in-prison custody time could be
applied to section 3000.1's parole discharge eligibility requirement,
15 because that requirement only applies to those parolees on lifetime
parole.  In *McQuillion v. Duncan* (9th Cir. 2003) 342 F.3d 1012
16 (*McQuillion*), McQuillion was unlawfully held beyond his parole
release date. The Ninth Circuit concluded that the period during
17 which McQuillion was unlawfully incarcerated should be credited
against his three-year parole period.  Because McQuillion, like
18 Bush, was subject to a fixed parole period, not lifetime parole, the
Ninth Circuit made no mention of section 3000.1's parole
19 discharge eligibility requirement.

20    The two federal district court cases that Chaudhary cites are
similarly distinguishable. In *Martin v. Marshall* (N.D. Cal.2006)
21 448 F.Supp.2d 1143 (*Martin*), the court held, without any
substantial analysis, that the parolee was entitled to have "actual
22 surplus time served in prison deducted from his parole period."
Martin was not subject to section 3000.1's lifetime parole period,
23 because his offense occurred in 1979.  In *Carlin v. Wong* (N.D.
Cal. Aug. 4, 2008, No. C 06-4145 SI) 2008 WL 3183163 (*Carlin*),
24 the court held that Carlin should receive credit against his five-year
fixed parole period for time that he had spent unconstitutionally
25 incarcerated. Carlin was not subject to section 3000.1's lifetime
parole period, because his crime occurred prior to 1980.

26 172 Cal. App. 4th at 38.

1   credit against his period of parole of the time he had spent in prison in violation of his right to

2   due process.  The court explained:

3        However, neither respondent nor the *Chaudhary* court addressed
     the federal due process ramifications of a prisoner, such as

4        petitioner, being excessively confined for several years.
     Application of Section 3000.1 in the manner suggested by

5        respondent and the *Chaudhary* court would leave those prisoners
     without any effective remedy for their unconstitutional

6        confinement.  The Ninth Circuit's ruling in *McQuillion v. Duncan*,
     342 F.3d 1012, 1015 (9th Cir. 2003) ("*McQuillion II*") suggests

7        that such an application is not constitutionally acceptable.

8        In *McQuillion v. Duncan*, 306 F.3d 895, 912 (9th Cir. 2002)
     ("*McQuillion I*"), the Ninth Circuit determined that the appropriate

9        remedy for a state prisoner whose parole date had been rescinded
     in violation of due process was immediate release.  However, there

10       had been at least a three-year delay between the constitutional
     injury, i.e., the illegal restraint, and the grant of habeas relief.

11       *McQuillion II*, 342 F.3d at 1015.  Thus, in response to the
     California Attorney General's later assertion that the appropriate

12       relief was release to a state-mandated three-year period of parole,
     the Ninth Circuit explained:

13

14            This argument overlooks the fact that if McQuillion
          had been released on the date to which he was

15            entitled, he would have been released in May 1994.
          The three-year parole, which he would have been

16            required to serve if he had been released on time,
          has long since expired.

17       *McQuillion II*, 342 F.3d at 1015.  Although the *Chaudhary* court
     distinguished *McQuillion* on the grounds that McQuillion was

18       subject to a fixed parole period, not lifetime parole, the *Chaudhary*
     court did not acknowledge the rationale set forth in *McQuillion*:

19       that a prisoner who is unconstitutionally confined should be given
     credit for that time and placed in the position he would have been

20       in had he been released on time.  *McQuillion II*, 342 F.3d at 1015;
     *see also Carlin v. Wong*, 2008 WL 3183163, at *2 (N.D. Cal. Aug.

21       4, 2008) ("[T]he court finds that the actual surplus time that
     petitioner has been incarcerated beyond his parole date should be

22       credited toward his post-release parole period."); *Martin v.
     Marshall*, 448 F. Supp. 2d 1143, 1145 (N.D. Cal. 2006) (finding

23       that the actual surplus time petitioner served in prison should be
     deducted from his parole period).

24

25  /////

26  /////

1   2009 WL 4530533 at *4.  The court in <u>Thompson</u> concluded that the petitioner was entitled to

2   "be placed in the position he would have been in had he been released on time."  <u>Id.</u> at *5. [7]

3              Another district court has rejected the reasoning of <u>Thompson</u> and concluded that

4   if a petitioner is released on parole pursuant to California Penal Code § 3000.1, there is no

5   further remedy that the federal court can fashion even if the petitioner prevailed on his habeas

6   challenge to an earlier parole denial.  <u>See Boyd v. Salazar</u>, No. CV 08-2727-MMM (RNB), 2009

7   WL 2252507 (C.D. Cal. July 28, 2009).  That court explained:

8              The gravamen of petitioner's opposition to the Motion to Dismiss
             is that he continues to suffer an actual injury that can be traced
9             back to the Governor's reversal of the BPT's 2006 parole grant for
             which the Court can provide concrete relief.  According to
10            petitioner, if the District Judge adopts the Magistrate Judge's
             earlier findings and conclusions to the effect that the Governor's
11            reversal of the BPT's 2006 parole grant violated due process and
             grants habeas relief, petitioner "is entitled to have his excess time
12            from that illegal confinement in prison applied to his parole period,
             which would advance the date of his presumptive five-year parole
13            discharge review."  In support of this proposition, petitioner has
             cited <u>In re Bush</u>, 161 Cal. App.4th 133, 145, 74 Cal. Rptr.3d 256
14            (2008), <u>McQuillion v. Duncan</u>, 342 F.3d 1012, 1015 (9th Cir.
             2003), and several federal district court cases in which the
15            successful habeas petitioner received credit against his parole
             period.
16
             The Court notes, however, that in <u>Bush</u>, <u>McQuillion</u>, and all but
17            one of the district court cases cited by petitioner, the petitioner was
             serving a fixed parole term and not a lifetime parole term, as
18            petitioner here is serving by virtue of the fact that the second
             degree murder he committed was committed after January 1, 1983.
19            See Cal. Penal Code § 3000.1(a); 15 C.C.R. § 2515(f).  Under
             Cal.Penal Code § 3000.1(b), the requirement that petitioner be
20            released from parole unless the BPT determines there is good cause
             to retain him on parole will not be triggered until petitioner "has
21            been on parole continuously" for five years.  In a recent California

22

23            [7] In <u>Thompson</u>, after habeas relief was initially granted, respondent filed a motion for
     relief from judgment informing the court that the petitioner was not subject to a five-year parole
24   period, as Thompson had been advised in writing at the time of his release, but to lifetime parole
     pursuant to California Penal Code § 3000.1.  Further findings and recommendations were then
25   issued, which the assigned district judge adopted, vacating the original judgment, again granting
     the habeas application, and this time directing that respondent discharge petitioner from parole.
26   As in the instant case, the state in <u>Thompson</u> was apparently unaware of the ramifications of §
     3000.1 to prisoners convicted after its effective date.

Court of Appeal decision that post-dated the original Report and Recommendation herein, the Court of Appeal relied on this distinction between a fixed parole term and a lifetime parole term in denying the claim of a petitioner subject to a lifetime parole term that he was entitled to credit against § 3000.1's parole discharge eligibility requirement.  See In re Chaudhary, 172 Cal. App.4th 32, 90 Cal. Rptr.3d 678 (2009).  Although the Magistrate Judge in one of the district court cases cited by petitioner rejected this distinction, see Thompson v. Carey, No. CIV S-05-1708 GEB EFB P, 2009 WL 453053, at *5 (E.D. Cal. Feb.23, 2009), Report and Recommendation adopted at 2009 WL 800166 (March 25, 2009), that case is not binding precedent on another federal district court and the Court finds the reasoning of the Chaudhary court more persuasive.

2009 WL 2252507 at *1-2.

Finally, in Irons v. Sisto, No. CIV-S-05-0912 JAM CHS P, 2009 WL 2171084, at *1-2, (E.D. Cal. July 20, 2009), the district court, relying on the decision in Chaudhary, found the habeas petition moot where the petitioner was released to an indeterminate parole term pursuant to California Penal Code § 3000.1.  Noting that California regulations require the parole board to consider, among other things, the parolee's adjustment to society during the five-year period between the parole release date and the date of the parole discharge eligibility hearing mandated by California Penal Code § 3000.1, the court concluded that "because petitioner . . . has only begun to serve his minimum five year continuous parole term, he cannot be granted further relief in this case."  2009 WL 2171084, at *2.

D. Analysis

The question before the court with regard to mootness is whether there is any relief this court could grant to petitioner in the event he prevails on his habeas petition.  The undersigned concludes that the decision of the California Court of Appeal in Chaudhary does not preclude this court from rectifying a federal due process violation in the context of a federal proceeding.  In an action seeking federal habeas relief, this court may fashion a remedy for a federal constitutional violation "as law and justice require."  Sanders, 21 F.3d at 1461.  See also Bush v. Solis, No. C04-1823 MHP, 2004 WL 2600141, at *4 (N.D. Cal. Nov. 16, 2004) ("When

12

1   a decision violates [federal due process standards], the court may provide any relief under its

2   habeas power appropriate to remedy the violation, including release.").  Although state courts are

3   the "ultimate expositors of state law," Mullaney v. Wilbur, 421 U.S. 684, 691 (1975), this court

4   is charged with fashioning a remedy for violations of the U.S. Constitution.  The state appellate

5   court in Chaudhary was concerned merely with determining the appropriate remedy for a

6   violation of state law.  Thus, the opinion in Chaudhary simply interpreted California Penal Code

7   § 3000.1 and applied it in the context of that case.  The Chaudhary decision did not purport to

8   limit the remedy a federal court may fashion to address a federal due process violation, nor could

9   it.  For, a decision by one appellate division of the California Court of Appeal may not limit or

10  define the scope of the federal court's remedial powers under federal habeas.  See Thomas v.

11  Yates, 637 F.Supp.2d at 842 ("Although California law determines the terms of a prisoner's

12  parole, it is the duty of a federal habeas court to determine whether such parole custody violates

13  the prisoner's constitutional rights; if so, the Court may grant relief").

14          There is a remedy this court could grant if petitioner prevailed on the instant

15  petition, consistent with principles of fundamental fairness.  Specifically, if petitioner is entitled

16  to have the time he served in excess of his rightful release date counted against his five-year

17  minimum parole term, pursuant to California Penal Code § 3000.1(b) he would be entitled to a

18  reduction in the time he would have to wait for a parole discharge review.  This remedy does not

19  attempt to "apply 'credits' to a lifetime parole period."  See Chaudhary. 172 Cal. App. 4th at 38

20  (disapproving such a remedy).  Instead, the "credits" would be applied to the five year

21  presumptive parole term set forth in the state statute.  In the context of fashioning a remedy for a

22  federal due process violation, there is no rational distinction between prisoners who are released

23  to a determinate five year parole period and those who are released pursuant to California Penal

24  Code § 3000.1, with its five-year presumptive parole period.  Indeed, logic would dictate that if

25  prisoners with a determinate parole period are entitled to a full credit for time spent unlawfully in

26  prison, thereby potentially being released from parole outright, certainly credit should be given to

1   prisoners who would be entitled to receive, at most, a hearing to determine whether they should

2   be released on parole.  To the extent the state has an interest in observing the parolee's

3   adjustment on parole before allowing him to be discharged from parole, this interest could clearly

4   be properly vindicated at the parole discharge hearing.  See Cal. Code Regs., tit 15, § 2535(d).

5           Neither respondent nor the court in Chaudhary address the interplay between a

6   federal due process violation and the California parole discharge statute or the ramifications that

7   result from this interplay.  In light of this, the decision in Chaudhary is not on point and does not

8   dictate the result in the present case.  Application of California Penal Code § 3000.1 in the

9   manner suggested by respondent under Chaudhary would leave prisoners granted federal habeas

10  relief due to constitutional error after they have been released from prison without any effective

11  remedy for their unconstitutional confinement and would lead to an unfair and irrational result.

12  See Thomas v. Yates, 637 F.Supp.2d at 842 ("Respondent points to no authority – state or federal

13  – that stand for the proposition that a federal habeas court may not shorten the duration of a

14  parolee's period of parole supervision in order to vindicate the parolee's constitutional rights").

15          In McQuillion v. Duncan, 306 F.3d 895, 912 (9th Cir. 2002) ("McQuillion I"), the

16  court determined that the appropriate remedy for a state prisoner whose parole date had been

17  rescinded in violation of due process was immediate release.  The California Attorney General

18  had argued that the appropriate relief was release to a state-mandated three-year period of parole.

19  The Ninth Circuit disagreed:

20              This argument overlooks the fact that if McQuillion had been
                released on the date to which he was entitled, he would have been
21              released in May 1994.  The three-year parole, which he would have
                been required to serve if he had been released on time, has long
22              since expired.

23  McQuillion II, 342 F.3d at 1015.  Although the state appellate court in Chaudhary distinguished

24  McQuillion on the grounds that McQuillion was subject to a fixed parole period, and not lifetime

25  parole, the opinion fails to explain why this is a distinction with a difference.  Further, the court

26  in Chaudhary did not acknowledge the rationale set forth in McQuillion - that a prisoner who is

1   unconstitutionally confined should be given credit for that time and placed in the position he

2   would have been in had he been released on time.  McQuillion II, 342 F.3d at 1015; see also

3   Carlin, 2008 WL 3183163, at *2 ("[T]he court finds that the actual surplus time that petitioner

4   has been incarcerated beyond his parole date should be credited toward his post-release parole

5   period."); Martin v. Marshall, 448 F.Supp.2d 1143, 1145 (N.D. Cal. 2006) (finding that the

6   actual surplus time petitioner served in prison should be deducted from his parole period).  The

7   Ninth Circuit's ruling in McQuillion reflects the notion that the absence of a remedy for a

8   constitutional violation is not to be easily accepted.  Due process violations should not go

9   unaddressed merely because a prisoner is released on parole sometime after the violation but

10  before the prisoner's habeas petition is considered on its merits by the federal court.

11          For the reasons set forth above, the undersigned concludes that relief is not

12  foreclosed to petitioner in the event he prevails on his habeas petition pending before the court.

13  Therefore, the instant action is not moot.  Specifically, any excess time petitioner spent in prison

14  in violation of his right to due process could be credited against the five-year parole discharge

15  eligibility requirement in order to mitigate any constitutional injury petitioner may have suffered.

16  Such a remedy is consistent with the duty of a federal court to fashion a remedy for a violation of

17  the federal constitution as due process requires.[8]  Accordingly, below the court will address the

18  merits of petitioner's habeas petition.

19  /////

20  /////

21

22      [8]  The undersigned rejects remand to the Governor as a potentially appropriate remedy in
    light of the procedural posture of this case.  See McQuillion II, 342 F.3d at 1015 ("Since we have
23  reviewed the materials that were before the Board and found no evidence to support a decision
    other than the one reached by the Board, a remand to the Governor in this case would amount to
24  an idle act."); Delaplane v. Marshall, No. CV 08-2306 JFW (MAN), 2009 WL 3806261, at *1
    (C.D. Cal. Nov. 12, 2009) ("Thus, when a court has concluded that the record does not contain
25  "some evidence" to support the Governor's determination that an inmate is unsuitable for parole,
    a remand to the Governor would not serve any purpose, and the proper disposition is to reinstate
26  the Board's decision and order the inmate's release if the release date set by the Board has
    passed").

ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a

federal habeas court independently reviews the record to determine whether habeas corpus relief

is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003);

Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not

reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the

AEDPA's deferential standard does not apply and a federal habeas court must review the claim

de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160,

1167 (9th Cir. 2002).  Here, the last reasoned state court decision is the December 15, 2004

denial of habeas corpus by the Sacramento County Superior Court.  Therefore, this court will

consider whether that decision was erroneous under the standard set forth in 28 U.S.C. § 2254(d).

II.  Petitioner's Claims

    A.  Due Process

        Petitioner alleges that the Governor's September 22, 2004 reversal of the Board's

2004 grant of parole violated his right to due process under the United States Constitution.  (Pet.

at 5, 5-A, 5-B, 5-C.)  The court will analyze this claim below.

        1.  Due Process in the California Parole Context

        The Due Process Clause of the Fourteenth Amendment prohibits state action that

deprives a person of life, liberty, or property without due process of law.  One alleging a due

process violation must first demonstrate that he was deprived of a liberty or property interest

protected by the Due Process Clause and then show that the procedures attendant upon the

deprivation were not constitutionally sufficient.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454,

459-60 (1989); McQuillion I, 306 F.3d at 900.

        A protected liberty interest may arise from either the Due Process Clause of the

United States Constitution or state laws.  Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).  The

United States Constitution does not, of its own force, create a protected liberty interest in a parole

date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, "a

state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release

1  will be granted' when or unless certain designated findings are made, and thereby gives rise to a

2  constitutional liberty interest." McQuillion I, 306 F.3d at 901 (quoting Greenholtz v. Inmates of

3  Neb. Penal, 442 U.S. 1, 12 (1979)).

4          California's parole scheme gives rise to a cognizable liberty interest in release on

5  parole, even for prisoners who have not already been granted a parole date. Sass v. Cal. Bd. of

6  Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th

7  Cir. 2003); McQuillion I, 306 F.3d at 903; see also In re Lawrence, 44  Cal. 4th 1181, 1204,

8  1210, 1221 (2008).  Accordingly, this court must examine whether California provided the

9  constitutionally-required procedural safeguards when depriving petitioner of a protected liberty

10  interest and, if not, whether the Sacramento County Superior Court's conclusion that it did was

11  contrary to or an unreasonable application of clearly established federal law as determined by the

12  Supreme Court.

13          It is clearly established federal law that a parole board's decision deprives a

14  prisoner of due process with respect to his constitutionally protected liberty interest in a parole

15  release date if the Board's decision is not supported by "some evidence in the record."

16  Superintendent v. Hill, 472 U.S. 445, 457 (1985); Irons v. Carey, 505 F.3d 846, 851 (9th Cir.

17  2007); Sass, 461 F.3d at 1128; Biggs, 334 F.3d at 915.  "The 'some evidence' standard is

18  minimally stringent," and a decision will be upheld if there is any evidence in the record that

19  could support the conclusion reached by the factfinder.  Powell v. Gomez, 33 F.3d 39, 40 (9th

20  Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)).  See also Toussaint v.

21  McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence underlying the board's

22  decision must have some indicia of reliability." Jancsek v. Or. Bd. of Parole, 833 F.2d 1389,

23  1390 (9th Cir. 1987). See also Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992).

24  Determining whether the "some evidence" standard is satisfied does not require examination of

25  the entire record, independent assessment of the credibility of witnesses, or the weighing of

26  /////

1   evidence.  <u>Toussaint</u>, 801 F.2d at 1105.  The question is whether there is any reliable evidence in

2   the record that could support the conclusion reached.  <u>Id</u>.

3            Under California law, the Governor considers the same factors as the Board in

4   determining whether to affirm or reverse the Board's parole decision.  Cal. Const., art. V,  § 8(b);

5   <u>see also</u> <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 660 (2002).  Therefore, the Governor's decision to

6   reverse a parole grant is reviewed under the same procedural due process principles that are used

7   to review challenges to the Board's denial of parole.

8            When assessing whether a state parole board's suitability decision, or in the

9   present case, the Governor's reversal of the Board's decision, was supported by "some

10  evidence," the analysis "is framed by the statutes and regulations governing parole suitability

11  determinations in the relevant state."  <u>Irons</u>, 505 F.3d at 851.   Therefore, this court must:

12           look to California law to determine the findings that are necessary
             to deem a prisoner unsuitable for parole, and then must review the
13           record in order to determine whether the state court decision
             holding that these findings were supported by "some evidence" in
14           [petitioner's] case constituted an unreasonable application of the
             "some evidence" principle articulated in <u>Hill</u>.
15

16  (<u>Id</u>.)

17           Under California law, prisoners serving indeterminate prison sentences "may

18  serve up to life in prison, but they become eligible for parole consideration after serving

19  minimum terms of confinement."  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1078 (2005).  The Board

20  normally sets a parole release date one year prior to the inmate's minimum eligible parole release

21  date, and does so "in a manner that will provide uniform terms for offenses of similar gravity and

22  magnitude in respect to their threat to the public."  <u>In re Lawrence</u>, 44 Cal. 4th at 1202 (citing

23  California Penal Code § 3041(a).  A release date must be set "unless [the Board] determines that

24  the gravity of the current convicted offense or offenses, or the timing and gravity of current or

25  past convicted offense or offenses, is such that consideration of the public safety requires a more

26  /////

1   lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ." Cal.

2   Penal Code § 3041(b).

3          In order to carry out the mandate of § 3041, the Board must determine "whether

4   the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus

5   whether he or she is suitable for parole." In re Lawrence, 44 Cal. 4th at 1202 (citing California

6   Code Regs., tit. 15, § 2281(a)).  In doing so, the Board must consider all relevant, reliable

7   information available regarding

8             the circumstances of the prisoner's social history; past and present
              mental state; past criminal history, including involvement in other
9             criminal misconduct which is reliably documented; the base and
              other commitment offenses, including behavior before, during and
10            after the crime; past and present attitude toward the crime; any
              conditions of treatment or control, including the use of special
11            conditions under which the prisoner may safely be released to the
              community; and any other information which bears on the
12            prisoner's suitability for release.

13  Cal. Code Regs., tit. 15, § 2281(b).

14         The regulation identifies circumstances that tend to show suitability or

15  unsuitability for release.  Cal. Code Regs., tit. 15, § 2281(c) & (d).  The following circumstances

16  have been identified as tending to show that a prisoner is suitable for release: (1) the prisoner has

17  no juvenile record of assaulting others or committing crimes with a potential of personal harm to

18  victims; (2) the prisoner has experienced reasonably stable relationships with others; (3) the

19  prisoner has performed acts that tend to indicate the presence of remorse or has given indications

20  that he understands the nature and magnitude of his offense; (4) the prisoner committed his crime

21  as the result of significant stress in his life; (5) the prisoner's criminal behavior resulted from

22  having been victimized by battered women syndrome; (6) the prisoner lacks a significant history

23  of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the

24  prisoner has made realistic plans for release or has developed marketable skills that can be put to

25  use upon release; and (9) institutional activities indicate an enhanced ability to function within

26  the law upon release.  Cal. Code Regs., tit. 15, § 2281(d).

1        The following circumstances have been identified as tending to indicate

2    unsuitability for release: (1) the prisoner committed the offense in an especially heinous,

3    atrocious, or cruel manner; (2) the prisoner had a previous record of violence; (3) the prisoner has

4    an unstable social history; (4) the prisoner's crime was a sadistic sexual offense; (5) the prisoner

5    had a lengthy history of severe mental problems related to the offense; and (6) the prisoner has

6    engaged in serious misconduct in prison.  Cal. Code Regs., tit. 15, § 2281(c).  Factors to consider

7    in deciding whether the prisoner's offense was committed in an especially heinous, atrocious, or

8    cruel manner include: (A) multiple victims were attacked, injured, or killed in the same or

9    separate incidents; (B) the offense was carried out in a dispassionate and calculated manner, such

10   as an execution-style murder; (C) the victim was abused, defiled or mutilated during or after the

11   offense; (D) the offense was carried out in a manner that demonstrated an exceptionally callous

12   disregard for human suffering; and (E) the motive for the crime is inexplicable or very trivial in

13   relation to the offense.  Id. § 2281(c)(1)(A) - (E).

14       California law provides that the Board must set a release date "unless it

15   determines that the gravity of the current convicted offense or offenses, or the timing and gravity

16   of current or past convicted offense or offenses, is such that consideration of the public safety

17   requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be

18   fixed [.]"  Cal. Penal Code § 3041(b).  The overriding concern in determining parole suitability is

19   public safety.  Dannenberg, 34 Cal. 4th at 1086.  This "core determination of 'public safety'

20   . . . involves an assessment of an inmates current dangerousness."  Lawrence, 44  Cal. 4th at

21   1205 (emphasis in original).  See also Cal. Code Regs. tit. 15, § 2281(a) ("Regardless of the

22   length of time served, a life prisoner shall be found unsuitable for and denied parole if in the

23   judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released

24   from prison.")  Accordingly, under California law,

25           when a court reviews a decision of the Board or the Governor, the
             relevant inquiry is whether some evidence supports the decision of
26           the Board or the Governor that the inmate constitutes a current

21

1    threat to public safety, and not merely whether some evidence
     confirms the existence of certain factual findings.
2

3    Lawrence, 44 Cal. 4th at 1212 (citing In re Rosenkrantz, 29 Cal. 4th 616, 658 (2002);

4    Dannenberg, 34 Cal. 4th at 1071; and In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

5           In recent years the Ninth Circuit Court of Appeals has concluded that, given the

6    liberty interest that California prisoners have in release on parole, a continued reliance upon an

7    unchanging factor to support a finding of unsuitability for parole may, over time, constitute a

8    violation of due process.  The court has addressed the issue in three significant cases, each of

9    which will be discussed below.

10          First, in Biggs, the Ninth Circuit Court of Appeals recognized that a continued

11   reliance on an unchanging factor to deny parole, such as the circumstances of the offense, could

12   at some point result in a due process violation.[9]  While the court in Biggs rejected several of the

13   reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld

14   three:  (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was

15   carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3)

16   petitioner could benefit from therapy.  Biggs, 334 F.3d at 913.  However, the court in Biggs

17   cautioned that continued reliance solely upon the gravity of the offense of conviction and

18   petitioner's conduct prior to committing that offense in denying parole could, at some point,

19   violate due process.  In this regard, the court observed:

20          As in the present instance, the parole board's sole supportable
            reliance on the gravity of the offense and conduct prior to
21          imprisonment to justify denial of parole can be initially justified as
            fulfilling the requirements set forth by state law.  Over time,
22          however, should Biggs continue to demonstrate exemplary
            behavior and evidence of rehabilitation, denying him a parole date
23          simply because of the nature of Biggs' offense and prior conduct
            would raise serious questions involving his liberty interest in
24          parole.

25   _____

26          [9]  That holding has been acknowledged as representing the law of the circuit.  Irons, 505
     F.3d at 853; Sass, 461 F.3d at 1129.

1   <u>Id</u>. at 916.  The court in <u>Biggs</u> also stated that "[a] continued reliance in the future on an

2   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

3   contrary to the rehabilitative goals espoused by the prison system and could result in a due

4   process violation."  <u>Biggs</u>. 334 F.3d at 917.

5          In <u>Sass</u>, the Board found the petitioner unsuitable for parole at his third suitability

6   hearing based on the gravity of his offenses of conviction in combination with his prior offenses.

7   461 F.3d at 1126.  Citing <u>Biggs</u>, the petitioner in <u>Sass</u> contended that reliance on these

8   unchanging factors violated due process.  The court disagreed, concluding that these factors

9   amounted to "some evidence" to support the Board's determination.  <u>Id</u>. at 1129.  The court

10  provided the following explanation for its holding:

11          While upholding an unsuitability determination based on these
            same factors, we previously acknowledged that "continued reliance
12          in the future on an unchanging factor, the circumstance of the
            offense and conduct prior to imprisonment, runs contrary to the
13          rehabilitative goals espoused by the prison system and *could* result
            in a due process violation."  <u>Biggs</u>, 334 F.3d at 917 (emphasis
14          added).  Under AEDPA it is not our function to speculate about
            how future parole hearings could proceed.  <u>Cf</u>. <u>id</u>.  The evidence of
15          Sass' prior offenses and the gravity of his convicted offenses
            constitute some evidence to support the Board's decision.
16          Consequently, the state court decisions upholding the denials were
            neither contrary to, nor did they involve an unreasonable
17          application of, clearly established Federal law as determined by the
            Supreme Court of the United States.  28 U.S.C. § 2254(d).

18

19  <u>Id</u>.

20          In <u>Irons</u>, the Ninth Circuit sought to harmonize the holdings in <u>Biggs</u> and <u>Sass</u>,

21  stating as follows:

22          Because the murder Sass committed was less callous and cruel than
            the one committed by Irons, and because Sass was likewise denied
23          parole in spite of exemplary conduct in prison and evidence of
            rehabilitation, our decision in <u>Sass</u> precludes us from accepting
24          Irons' due process argument or otherwise affirming the district
            court's grant of relief.

25
            We note that in all the cases in which we have held that a parole
26          board's decision to deem a prisoner unsuitable for parole solely on

1
2
3
4
5
6

the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.  Specifically, in <u>Biggs</u>, <u>Sass</u>, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.  <u>Biggs</u>, 334 F.3d at 912; <u>Sass</u>, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

7
8
9
10
11
12

Furthermore, we note that in <u>Sass</u> and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole.  We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.  <u>Biggs</u>, 334 F.3d at 917.

13   <u>Irons</u>, 505 F.3d at 853-54.[10]

14            2.  Petitioner's State Proceedings

15            On May 3, 2004, the Board found petitioner suitable for parole and concluded that

16   he "would not pose an unreasonable risk of danger to society or a threat to public safety if

17   released from prison."  (Lodgment, Section 3 (hereinafter "Transcript") at 71.)  The Board stated

18   that its conclusion was based on the following circumstances: (1) petitioner had no juvenile

19   record of assaulting others; (2) petitioner had a stable social history as exhibited by reasonably

20   stable relationships with family; (3) petitioner had enhanced his ability to function within the law

21

22
23
24
25
26

   [10]  The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety.  <u>In re Lawrence</u>, 44 Cal. 4th at 1218-20 & n. 20.  Additionally, a recent panel of the Ninth Circuit in <u>Hayward v. Marshall</u>, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society.  However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc.  <u>Hayward v. Marshall</u>, 527 F.3d 797 (9th Cir. 2008).  Therefore, the panel decision in <u>Hayward</u> is no longer citable precedent.

24

upon release through participation in a variety of programs, including completion of a GED in 1987, completion of 27 units towards an A.A. degree in general education through Solano Community College, participation in self-help and therapy groups such as Breaking Barriers, AA, Life Skills Management, Pre-Release Education program, 21 hour Basic Alternatives to Violence Project, a Walk-a-Thon for Abused Children, a 14 hour intensive journalism workshop, and Anger Management; (4) petitioner had completed four vocational programs including welding, plumbing, upholstery, and air conditioning and refrigeration; (5) petitioner lacked a significant criminal history in terms of violent crime; (6) petitioner's maturation, growth, and greater understanding reduced his probability of recidivism; (7) petitioner had realistic parole plans, including a job offer, numerous letters of support from family, and numerous letters of employment support; (8) petitioner maintained close family ties via letters and visits received; (9) petitioner maintained positive institutional behavior while incarcerated, which indicated significant self-control; (10) petitioner had not been cited for received any disciplinary violations since he had been incarcerated; and (11) petitioner appropriately showed signs of remorse, an understanding of the nature and magnitude of his offense, an acceptance of full responsibility for his criminal behavior, and a desire to change toward good citizenship.  (Id. at 71-73.)  According to petitioner, "the District Attorney's Office of Sacramento County, did not oppose parole or attend the hearing."  (Pet. at 5-A.)

The Board also considered a psychological report dated October 30, 2001, providing a favorable evaluation of petitioner.  The Board read a portion of that positive evaluation into the record in which petitioner was assessed as posing an "extremely low" risk of dangerousness, with an "extremely small" violence potential in a structured or unstructured environment.  (Transcript at 74.)  The psychological report also indicated that factors contributing to petitioner's extremely low scores included a strong, secure, and stable childhood environment, excellent school performance, and an excellent mental health history in terms of relationships.  (Id. at 74-75.)  According to the psychological evaluation, petitioner exhibited no

evidence of personality disorder or psychopathy and had an exceptional level of insight based on self-reflection and values.  (Id. at 75.)  "Petitioner presented an exceptionally positive attitude through a difficult incarceration . . . demonstrat[ing] self-control and self-direction in spite of his vulnerability to pressure of the Northern versus Southern alliance within the prison."  (Id. at 75-76.)  The report further indicated that petitioner had multiple laudatory chronos suggesting that he was an "industrious, oriented, productive member of society."  (Id. at 76.)  Petitioner was also found to have demonstrated "an admirable ability to negotiate hostile and aggressive circumstances" in a way that lead to "a peaceful negotiation and positive outcome."  (Id. at 77.)  Regarding blame, the psychological report noted that petitioner admitted responsibility for the fray that resulted in the death of a human being, expressed clearly that he had no intention of taking anyone's life, and recognized the role alcohol played in his youth.  (Id.)  The favorable psychological report also noted that

> in spite of the fact that the record reflects that the charges of battery by bat leading to the death of the victim were originally charged to the co-defendant, it also reflects the transfer of those charges to the inmate after a deal was made by the other with the district attorney.

(Id. at 78.)  The report concluded that "there are no psychological factors that would interfere with a successful parole . . . [and] several factors suggesting that the inmate is an excellent candidate for a successful parole."  (Id. at 79.)

In spite of this glowing assessment, on September 30, 2004, Governor Arnold Schwarzenegger reversed the Board's decision granting parole.  The Governor explained his decision as follows:

> During the early morning of December 30, 1986, [petitioner] chased and participated in the fatal baseball-bat beating of 20-year-old Dan Lacy, a sailor home on leave from the United States Navy.  When Mr. Lacy failed to return home, his family filed a missing-persons report and a search party was assembled to look for him.  Relatives of Mr. Lacy found his dead body in a drainage ditch.
>
> The night before the murder, Mr. Lacy and a friend went to a cocktail lounge.  As they were leaving the parking lot in his

friend's truck, they were approached by [petitioner] and Peter Gallegos.  Following a verbal exchange, Mr. Gallegos struck Mr. Lacy through the open passenger window.  Mr. Lacy's friend started to drive away, and in the process hit a card driven by Michael Rosales.  Mr. Rosales and his passenger at the time, Robert Clement, were friends with [petitioner].  Mr. Lacy and his friend drove off and Mr. Rosales chased them in his car, ultimately catching them.  Mr. Lacy's friend was pulled from the truck and kicked and hit multiple times.  He managed to get away and thought Mr. Lacy had done the same.  Mr. Rosales and Mr. Clement then left to return to the parking lot.

Meanwhile, [petitioner], who along with Mr. Gallegos, had been waiting in the parking lot for Mr. Rosales to return, called his friend, Ok Chul Shin.  Mr. Shin arrived at the parking lot just as Mr. Rosales and Mr. Clement were driving in.  Mr. Rosales dropped Mr. Clement off and left. [Petitioner], Mr. Shin, Mr. Gallegos, and Mr. Clement decided to go to where the truck was, which was some distance away.  Mr. Shin drove while Mr. Clement directed them to the truck's location.  As they got to the area, they saw Mr. Lacy–and all four of them got out of the car and began chasing him.  After chasing Mr. Lacy down in a tunnel, they beat him to death with the use of a baseball bat.

The next day, police received two anonymous calls implicating both [petitioner] and Mr. Shin in the murder.  Mr. Shin was arrested on January 1, 1987, and [petitioner] surrendered to police three days later.

A jury convicted [petitioner] of second-degree murder, and he was sentenced to 15 years to life in prison.  He received an additional one-year sentence for the use of a deadly weapon and was also ordered to pay restitution of $3200.  Mr. Shin pled guilty to voluntary manslaughter under a plea agreement.  No charges were filed against Mr. Clement, and charges against Mr. Gallegos were dismissed at the preliminary hearing.

For years, Mr. Rios denied any participation in the murder.  During his 1988 Youth Authority amenability determination, he claimed that Mr. Shin had the bat and was the only one who caught up with Mr. Lacy in the tunnel.  He further claimed that neither he nor Mr. Gallegos ever saw Mr. Lacy.  During his 1992 mental-health evaluation in prison, however, he admitted guilt for the murder, stating he was "one of five others" and that he "takes accountability" for the events that transpired. [Petitioner] maintains that he is sincerely remorseful and that he takes responsibility for Mr. Lacy's death.

[Petitioner] told the 2004 Board panel that he went into the tunnel after Mr. Shin "with the sole purpose of making sure that my friend was going to be okay and that he wasn't down there by himself."

He also told the Board at that hearing that by the time he caught up with Mr. Shin and Mr. Lacy in the tunnel, Mr. Lacy was "getting the best" of Mr. Shin, and that is when he grabbed Mr. Lacy off Mr. Shin and began fighting with him.  He said that Mr. Shin then hit Mr. Lacy "once or twice" and Mr. Lacy fell.  According to him, he then told Mr. Shin, "let's get out of here" and also told Mr. Gallegos, "Shin hit the dude in the head.  You know, he's down, let's go." [Petitioner] maintains that it was Mr. Shin who was armed with the bat–and at the same time–he asserts that he became involved in the brawl because Mr. Lacy–who was unarmed–was "getting the best" of Mr. Shin.  However, according to the District Attorney's statement for the probation report, there was testimony at trial that while Mr. Lacy was being kicked by others, [Petitioner] struck him several times in the back of head [sic] using a baseball bat.  Moreover, [petitioner], Mr. Gallegos, and Mr. Clement each had previous involvement with Mr. Lacy on the night of the murder, while Mr. Shin, the one person in the group who had no previous contact with Mr. Lacy, was the first one to chase him, the only one armed, and the primary instigator and attacker.  Although the record before me does not establish the details of [petitioner's] actions, it does establish that [petitioner] was a willing participant in the chasing down and killing of Mr. Lacy.

[Petitioner] at the time of Mr. Lacy's murder was 17 years old, and had not completed high school, was abusing alcohol and drugs, and had affiliated himself with gang associates.  Although he had no history of violence or assaultive behavior, he had been previously adjudicated as a juvenile for burglary, grand-theft auto, and drunk driving.  As a result, he was at various times made a ward of the court, committed to the care and custody of his parents, ordered to serve on a juvenile work project and to perform volunteer services, ordered to pay restitution, and ordered to attend alcohol-abuse counseling.  According to the probation report, [petitioner] failed to pay the restitution, made no effort to complete his community service, and made no attempt to attend alcohol counseling.

During his incarceration, however, [petitioner] has managed to remain discipline-free and has worked to better himself and enhance his ability to function within the law upon release.  He completed his GED while in county jail, and since coming to prison he has completed 27 units toward an Associate of Arts degree.  He has also completed vocational upholstery, air conditioning and refrigeration, welding, and plumbing, and he has been commended by various prison staff for his work performance, his willingness to work hard, and his dedication to a program for at-risk youth.  He has availed himself of an array of self-help and therapy, including Alcoholics Anonymous consistently since 1993, Breaking Barriers, Life Skills Management, Pre-Release Education Program, Basic Alternatives to Violence Project Workshop, and the Folsom Prison Youth Diversion Program.  He has received positive mental-health and Life Prisoner evaluations as well as

favorable risk assessments.  These are all factors that support [petitioner's] release to parole.

Additionally, [petitioner] has established relationships with supportive family members and others while in prison and has made solid plans to live with an older brother upon parole.  He has also developed marketable skills that can be put to good use upon parole and has made some employment inquiries to this end. Despite this, however, [petitioner] does not currently have any employment offers or prospects lined up for his release to parole. Although not a factor on which I base my decision today, as a capable 35-year-old man–who has lived his entire adult life in prison–[petitioner] should have a structured environment that includes a legitimate way to provide financially for himself upon release.

[Petitioner] committed an exceedingly disturbing and vicious crime.  Without provocation, he participated in the savage capture and deadly beating of an unarmed man.  And he did so inexplicably, making this second-degree murder an especially cruel one.  When the Board asked [petitioner] at the 2004 hearing about the reason for Mr. Lacy's murder, [petitioner] said, "For me, personally, there was no reason for the crime." [Petitioner's] murderous conduct was not only senseless, it was grisly.  He maintains that he never hit Mr. Lacy with the bat, and even if his version is true, [petitioner] nonetheless demonstrated his chilling and exceptionally callous disregard for human suffering by joining in the attack on Mr. Lacy. [Petitioner's] concern should have quickly turned to Mr. Lacy as he witnessed this lone man being ganged up on and attacked with a deadly weapon.  And after the attack, although [petitioner] claims that he told his partners to leave Mr. Lacy because he was "down"–he made no effort to check on Mr. Lacy's condition.  The concern apparently shifted to vandalizing the truck and stealing the stereo, since that is what occurred.  The extraordinarily grave nature of this frenzied and vile attack alone outweighs the positive factors tending to support [petitioner's] parole.

[Petitioner] has matured from the cold-blooded 17-year-old who committed this crime to a remorseful man working to re-enter society as a law-abiding citizen.  But after carefully considering the same factors the Board must consider, I believe [petitioner] would pose an unreasonable risk of danger to the public if paroled at this time.  Accordingly, I REVERSE the Board of Prison Terms' 2004 decision to parole [petitioner].

(Answer, Ex. 2.)

/////

/////

Governor Schwarzenegger's reversal of the Board was reviewed by the Sacramento County Superior Court in considering the habeas petition filed by petitioner with that court. (Answer, Ex. 3.) In rejecting petitioner's due process challenge to the Governor's decision, that court reasoned as follows:

> the Governor may deny parole based solely on the commitment offense by considering all other relevant factors and finding the offense to be "particularly egregious to justify the denial of a parole date." (In re Ramirez (2001) 94 Cal. App. 4th 549, 569-570; In re Rosenkrantz, (2002) 29 Cal. 4t h 616, 660.) In making this determination, the Governor must consider other instances of the same crime or crimes and the length of time the inmate has served so as to arrive at a "uniform" term. (Id.) One way to compare crimes is to refer to the matrix in the regulations that fixes base terms to set a parole date once the inmate is found suitable for parole. (Id. at 570.)

## II.  APPLICATION TO PETITIONER

In his letter reversing the BPT's grant of parole, the Governor first details the commitment offense. (See Exhibit A.) After reviewing the procedural history, the statement summarizes the BPT hearing in which petitioner denied actually striking the fatal blows with the baseball bat, although the jury found that he used a deadly weapon. The Governor determined that regardless of whether Petitioner personally used the weapon, he "was a willing participant in the chasing down and killing of [the victim]." (Exhibit A at p. 2 of the statement of reasons.) The statement summarizes Petitioner's juvenile record, which did not include any crimes of violence. Two paragraphs are devoted to acknowledging factors favoring Petitioner's parole, including good prison conduct, participation in programs, favorable risk assessments, positive and supportive family relationships, and positive parole plans. Although the statement of reasons erroneously asserts that Petitioner does not have any employment offers, there is no indication that the Governor's decision was based on this factor. The statement then characterizes the commitment offense as an "exceedingly disturbing and vicious crime" based on the fact that Petitioner participated in the savage capture and deadly beating of an unarmed man. The Governor pointed to Petitioner's own statement at the BPT hearing that there was no reason for the crime. Petitioner never attempted to check on the victim's condition after the victim was "down." The Governor concluded that the nature of the offense outweighed the factors supporting parole for Petitioner and, therefore, he reversed the BPT's decision to parole Petitioner.

The opinion reflects the Governor's assessment of the crime as particularly egregious. The facts include that there was no reason

for the crime, as Petitioner acknowledged at the BPT hearing. In addition to killing the victim, the other participants also kicked and hit the victim's passenger, who was able to escape. Although Petitioner denied using a weapon, the weapon enhancement was found true at trial. All parties had numerous chances to avoid escalation of the events. In particular, after the initial confrontation, both the victim and his passenger were able to escape. It was only after Mr. Clement returned and told Petitioner and others to return to the scene of the attack and Mr. Shin and Petitioner chased the victim down, that the victim was beaten to death. Given the facts of the case, there is some evidence to support the Governor's finding that the commitment offense was particularly egregious in comparison to other second-degree murders. There is no evidence to show that the Governor failed to consider the factors in support of parole, as required. To the contrary, the statement sets forth two full paragraphs recognizing the factors in favor of granting Petitioner parole.

In addition, the statement notes that Petitioner was taken into custody in 1987 and was sentenced to an aggregate term of 16 years to life imprisonment. By implication, the Governor acknowledged that Petitioner has served up to 17 years in prison. The BPT determined that the base term for Petitioner's offense was 240 months, or 20 years. According to the regulations, 20 years is the middle or average term for a second-degree murder, where death resulted from severe trauma with deadly intensity and the victim and the prisoner had little or no personal prior relationship. (See Cal. Code Regs., tit. 15, § 2403(c).) Since Petitioner has served, at most, 17 years, and the base term for his offense is 20 years, there is some evidence to support the Governor's implicit finding that Petitioner has not served a sufficient number of years in comparison to similar second-degree murders.

(Id. at 2-3 of 5.)

### 3. Analysis

The last reasoned decision rejecting petitioner's due process claim is that of the Sacramento County Superior Court denying petitioner habeas relief with respect to the Governor's September 30, 2004 decision to reverse the grant of parole. The Superior Court found that the Governor's reliance on petitioner's commitment offense alone satisfied the "some evidence" standard and that no due process violation had occurred. (Answer, Ex. 3 at 1-3, 5.) That decision was contrary to the clearly established federal law discussed above. After taking into consideration the Ninth Circuit decisions in Biggs, Sass, and Irons, and for the reasons set

1   forth below, this court concludes that petitioner is entitled to federal habeas relief with respect to

2   his due process challenge to the Governor's September 30, 2004 decision to reverse the Board's

3   grant of parole to petitioner.

4               For the reasons elaborated on by the Board, the circumstances of petitioner's

5   commitment offense alone, when considered in light of the extensive and uncontradicted

6   evidence of petitioner's in-prison rehabilitation and exemplary behavior over 17 years in prison,

7   were no longer predictive of his current dangerousness in 2004.  In his reversal of the Board's

8   decision to grant parole the Governor articulated no nexus, and this court can find none, between

9   the unchanging circumstances of petitioner's crime of conviction and his dangerousness in 2004.

10  The murder of which petitioner was convicted back in 1988 was not committed in such an

11  especially heinous, atrocious, or cruel manner as to undermine the fact that petitioner's

12  rehabilitative efforts and performance over 17 years in prison demonstrate he no longer would

13  pose a danger to society if released on parole.  Petitioner has served more than the minimum

14  number of years required by his sentence and his record of rehabilitation, and therefore suitability

15  for parole, was exemplary in 2004.  The time had come when the circumstances of petitioner's

16  commitment offense not longer continued to be predictive of his current dangerousness when

17  considered in light of the other evidence in the record.  See Biggs, 334 F.3d at 916-17; Irons, 505

18  F.3d at 853-54.

19              The Sacramento County Superior Court also concluded that because petitioner

20  had not served the "base term" for his offense, which the Board had determined was 20 years,

21  "there is some evidence to support the Governor's implicit finding that Petitioner has not served

22  a sufficient number of years in comparison to similar second-degree murders." (Answer, Ex. 3 at

23  3.)  Petitioner had served 17 years on his 16 years to life sentence at the time of the May 3, 2004

24  parole consideration hearing.  For purposes of a federal due process analysis, petitioner had

25  therefore served his "minimum term."  See Irons, 505 F.3d at 853-54.  Further, although the

26  Governor did mention in his decision that petitioner was taken into custody in 1987 and

1   sentenced to 16 years to life in state prison, he did not state that his decision was based on the

2   length of petitioner's "base term" or on any other consideration having to do with the length of

3   time petitioner had spent in prison.  Rather, the Governor clearly explained that he reversed the

4   Board's 2004 suitability decision solely because of the nature of petitioner's crime of conviction.

5   Reliance on this sole, unchanging factor to reverse the grant of parole violated due process given

6   the record in this case.

7          In sum, this court concludes that there is insufficient evidence to support the

8   Governor's ultimate conclusion that petitioner would pose an unreasonable risk of danger if

9   released on parole in 2004.  The court notes in this regard that petitioner was only 17 years old at

10  the time of the crime and had no juvenile history of assault; the killing of the victim was not so

11  calculated and evil as to indicate, without more, that petitioner remained a continuing danger to

12  the public 17 years later as an adult; it is impressive that during his many years of imprisonment

13  petitioner has received no disciplinary write-ups; petitioner has effectively participated in

14  rehabilitative and educational programs, earning his GED and 27 units towards an A.A. degree;

15  psychological evaluations opined that he no longer represented a danger to public safety if

16  released on parole in 2004; and petitioner had a place to live and a supportive family if released.

17  Applying the federal due process principles expressed in the cases cited above, this court is

18  compelled to conclude that, in light of the period of time that has elapsed since the commitment

19  crime, which exceeds the minimum term of petitioner's sentence; evidence of petitioner's

20  post-conviction conduct and his rehabilitative efforts and psychological evaluations; and his

21  stable parole plans, there is no competent evidence to support the Governor's reversal of the

22  Board's grant of parole.  Under these circumstances, the decision of the Sacramento County

23  Superior Court denying habeas relief violated due process.

24         For the reasons explained above, this undersigned finds that petitioner is entitled

25  to be placed in the position he would have been in had he been released on parole at the

26  appropriate time.  Because it has been more than five years since petitioner should have been

1   released, petitioner is entitled to a discharge determination pursuant to California Penal Code

2   § 3000.1(b).  Respondent should be required to discharge petitioner from parole, as provided by

3   § 3000.1(b), unless the Board makes the required determination that there is good cause to retain

4   him on parole.

5       B.  Ex Post Facto

6           Petitioner also claims that, as applied to him, California Constitution Article V, §

7   8(b), which gives the Governor authority to reverse certain decisions of the Board, violates the

8   Ex Post Facto Clause of the United States Constitution.  However, the undersigned has

9   recommended that the instant habeas corpus petition be granted with respect to petitioner's due

10  process claim.  In light of that recommended disposition, the court need not address petitioner's

11  ex post facto claim.

12                          **CONCLUSION**

13          Accordingly, IT IS HEREBY RECOMMENDED that:

14          1.  Petitioner's application for a writ of habeas corpus be granted with respect to

15  his due process claim;

16          2.  Respondent be directed to discharge petitioner from parole within thirty days

17  from the date of any order adopting these findings and recommendations, as provided by

18  California Penal Code § 3000.1(b), unless the Board of Parole Hearings makes the required

19  determination that there is good cause to retain petitioner on parole, makes a written record of its

20  determination, and transmits a copy of the record to petitioner; and

21          3.  In the event petitioner is retained on parole, respondent be directed to provide

22  petitioner with a review by the Board of Parole Hearings each year thereafter, as provided by

23  California Penal Code § 3000.1(c).

24          These findings and recommendations are submitted to the United States District

25  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen

26  days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within seven days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 10, 2009.


_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:3:8
rios1711.hc

35